IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOSEPH D. PHILYAW,
    Plaintiff,

vs.                                               Case No.: 3:19cv332/MCR/EMT

OFFICER JOHN DOE NO. 1, et al.,
    Defendants.
_____/

## REPORT AND RECOMMENDATION

    Plaintiff, an inmate proceeding pro se, commenced this case by filing a civil rights complaint under 42 U.S.C. § 1983 (ECF No. 1). Leave to proceed in forma pauperis was granted (ECF No. 5). Now before the court is Plaintiff's Amended Complaint (and operative pleading) (ECF No. 12). The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

    Because Plaintiff is a prisoner, the court must review the complaint and dismiss it if satisfied that the action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915A. Upon consideration, and for the reasons given below, the court recommends that this action be dismissed for failing to state a plausible claim upon which relief may be granted.

Plaintiff names six Defendants in the Amended Complaint: Officer John Doe No. 1, Officer John Doe No. 2, Nurse Benfatto, Nurse Marty Klee, Nurse Allison Burgess, and Doctor Smith, all of whom were employed at the Escambia County Jail ("ECJ") at the time of the events giving rise to this action (ECF No. 12 at 2).

Plaintiff states that on April 27, 2018, he was transferred from Graceville Correctional Institution ("GCI") to the ECJ for temporary housing (ECF No. 12 at 5). He claims that upon his arrival at the ECJ, Classification Officer/EMT Godwin issued a paper "low bunk pass" to Plaintiff and assured him that information regarding his need for a low bunk pass would be entered into the ECJ's computer system (*id.*).[1] Plaintiff states he was then taken to "pre-class[ification]" on the second floor and, upon showing officers his paper pass, he was assigned a low bunk for the next three days (*id.*).

Plaintiff states that on April 30, he was moved "upstairs" to a different pod (ECF No. 12 at 5). Upon arriving at that pod, Plaintiff showed his low bunk pass to Officer John Doe No. 1 and was assigned to a bunk "on the floor" (presumably meaning a low bunk) (*id.*). Plaintiff alleges that the next day he was moved from the floor to a "top bunk" (*id.*). Plaintiff states he showed Defendant Doe No. 1 his low

---

[1] Plaintiff states he requires a low bunk pass because he has been diagnosed with grand mal and temporal lobe seizures, for which he takes medication (ECF No. 12 at 5).

bunk pass and advised that he had seizures and was at risk of falling and getting hurt; he also reminded Doe No. 1 that he had seen the low bunk pass the day before (*id*. at 5–6). Plaintiff states that Doe No. 1 advised there was "nothing in the system" about a pass and that Plaintiff "would sleep where [he is] told" or "go to the box" for refusing the assignment (*id*. at 6). Plaintiff states he advised the officer working the next shift, Defendant John Doe No. 2, of the situation, but a similar exchange transpired, and Plaintiff remained assigned to a top bunk (*id*.). Plaintiff states that the Doe Defendants could have called "medical" and confirmed that Plaintiff had been issued a low bunk pass, but neither did so (*id*.). Plaintiff claims to have suffered "psychological anguish" as a result of staying on the top bunk (*id*.).

Plaintiff next alleges that on June 21, 2018, between 7:30 p.m. and 8:30 p.m., he had a seizure and fell about five feet from his assigned top bunk to the floor (ECF No. 12 at 6). He claims to have injured his neck and back and, evidently, lost consciousness, because he states that when he "regained consciousness" he was surrounded by four or five officers and Nurse Benfatto (*id*). Plaintiff states he advised Benfatto that his neck and back were "hurting bad" and that his left leg was "tingling numb" (*id*. at 7). Plaintiff alleges that Benfatto instructed the officers to pick him up and carry him downstairs to a wheelchair, without first performing an examination and

without using a brace (*id.*). Plaintiff states he advised Benfatto that his neck and back were hurting "worse," and he requested to be seen by a doctor and taken to an emergency room ("E.R.") (*id.*). Plaintiff states Benfatto required him to push his feet into her hands, and then advised him that it was normal to hurt after a fall, that there was nothing wrong with him, and that he would be fine (*id.*). Benfatto administered seizure medication in an IV along with acetaminophen and Robaxin but did not conduct any further examination or administer treatment despite Plaintiff's complaints of pain and an inability to turn his head (*id.*).

Defendant Benfatto saw Plaintiff again the next day at medical upon Plaintiff's request. Plaintiff reported that his pain was "worse" and that he could "hardly move" (ECF No. 12 at 8). Plaintiff alleges Benfatto advised that: (1) there was nothing she could do for him; (2) he could not demand to see Defendant Dr. Smith because Smith knew of Plaintiff's situation, and he would decide when to see patients; and (3) Plaintiff would not be taken to an E.R. (*id.*). The following day, Plaintiff again requested to go to medical because he was in "a lot" of pain and "could not move [his] neck" or "turn [his] head" (*id.*). Plaintiff states he was seen by Defendant Nurse Marty Klee, who also denied his requests for medical treatment, to be seen by the

doctor, or to be taken to the E.R., and who also noted that Dr. Smith decided when to see inmate patients (*id.*).

On June 25, Plaintiff was seen by Defendant Nurse Allison Burgess. He advised her of everything that had happened to that point in time and claimed that the pain in his neck was worse; he also requested testing to confirm that the fall had caused no permanent damage (ECF No. 12 at 9). Plaintiff states Burgess advised that only an x-ray would be ordered, to "make sure nothing was broke [sic]" (*id.*). According to Plaintiff, he was again told that Defendant Dr. Smith had been informed of his condition and that he would see Plaintiff if he felt it was necessary (*id.*).

Plaintiff had an x-ray two days later, on June 27, but he was not seen again by medical staff until August 21, despite numerous sick call requests and grievances asking to be seen (*id.* at 10). Plaintiff claims that between June 27 and August 21, he continued to have pain in his neck and back, and he also requested special medical housing because he was having trouble moving around the regular dormitory (*id.*). Plaintiff notes that on July 20 he received one response to a sick call request from Defendant Burgess who advised Plaintiff to buy ibuprofen from the commissary, a medication he claims he is allergic to—and an allergy he claims Burgess should have known about because it is listed in his medical history (*id.*). Plaintiff was seen by

Burgess on August 21, 2018, and she assessed Plaintiff as "having muscel [sic] spasms" in his neck, but she did not provide any further treatment (*id*.).

The remaining factual allegations of the complaint do not indicate whether jail staff attributed his sole diagnosis of muscle spasms to the fall, although jail staff evidently noted Plaintiff's allegations of pain (ECF No. 12 at 10).  Plaintiff claims to still experience pain in his neck (*id*. at 7) and notes he has been prescribed acetaminophen, "musel [sic] rub, and Robaxon [sic]"since being transferred back to GCI (*id*. at 10).

Plaintiff claims that each Defendant violated his Eighth Amendment right to be free from cruel and unusual punishment (ECF No. 12 at 12).  More specifically, he faults Defendant Doe Nos. 1 and 2 for "fail[ing] to act" and Defendants Benfatto, Klee, Burgess, and Smith for providing inadequate medical care (*id*. at 12–13).  As relief, he seeks punitive and compensatory damages in various amounts from each Defendant in their individual capacities (*id*. 12, 14).

Generally speaking, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face to survive dismissal at the screening phase.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  The plausibility standard is met only where the facts

alleged enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint's allegations must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Mere "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," and a plaintiff cannot rely on "naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alteration omitted); *see also* Franklin v. Curry, 738 F.3d 1246, 1251 (11th Cir. 2013). Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679. Finally, in civil rights cases, "[m]ore than mere conclusory notice pleading is required . . . . A complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotation marks and alteration omitted).

As Plaintiff was previously advised (ECF No. 7), to successfully assert Eighth Amendment claims regarding conditions of confinement and inadequate medical care, he is required to satisfy both an objective and subjective component. Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000). *see also* Hudson v. McMillian, 503

U.S. 1, 8 (1992). With regard to confinement conditions, the challenged condition must be "extreme." Id. at 9. There must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'" Taylor, 221 F.3d at 1257 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation omitted)). While an inmate "need not await a tragic event" before seeking relief, Helling v. McKinney, 509 U.S. 25, 33 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety, id. at 35. Moreover,

> the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

Id. at 36. The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] . . . of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

Specifically with respect to medical care, an objectively serious deprivation requires a showing of an objectively "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730 (2002); *see also* Farmer v. Brennan, 511 U.S. 825, 834 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In addition, an objectively serious deprivation requires a showing that the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995).

In evaluating the subjective component for both challenges, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. Hudson, 503 U.S. at 8 (marks and citation omitted). The proper standard in evaluating each claim is that of deliberate indifference. Wilson, 501 U.S. at 303. Negligence does not suffice to satisfy this

standard. *Id*. at 305. However, a prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result." Farmer, 511 U.S. at 835. In defining the deliberate indifference standard, the Farmer Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id*. at 837. Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844. Consistent with foregoing standards, the Eleventh Circuit has stated that "deliberate indifference thus has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

Regarding complaints of medical care, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment. Taylor, 221 F.3d 1254. That is to say, deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care.

Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5th Cir. 1980). Similarly, a difference in medical opinion between the medical staff and the inmate as to the inmate's diagnosis or course of medical treatment does not support a claim of cruel and unusual punishment. *See* Estelle, 429 U.S. 97. A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris v. Thigpen, 941 F.2d 1495, 1507 (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)); *see also* Poag, 61 F.3d at 1547 (the failure to administer a stronger medication is generally a medical judgment that is not an appropriate basis for imposing liability). To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb Co., 774 F.2d 1567, 1575 (quotation omitted).

Plaintiff first complains that Defendant Officers John Doe No. 1 and No. 2 "failed to act" by refusing to honor his paper low bunk pass, view the pass, or confirm whether such a pass had been issued to Plaintiff, given that no evidence of a pass appeared in the ECJ's computerized records. These allegations are insufficient to state

a claim against the John Doe Defendants because, at most, the allegations show that they acted *negligently* in failing to honor Plaintiff's pass or ascertain whether Plaintiff in fact required or had been issued a low bunk pass. *See, e.g.*, Redding v. Georgia, 557 F. App'x 840, 844 (11th Cir. 2014) (unpublished but recognized as persuasive authority) (prisoner's allegation that prison officials denied him a bottom bunk assignment despite his having a "bottom bunk profile" (medical pass), was insufficient to show conduct rising above gross negligence, and thus failed to state an Eighth Amendment claim); Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000) ("[F]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence."); Bowman v. Mazur, 435 F. App'x 82, 84 (3d Cir. 2011) (prison officials were not deliberately indifferent to inmate's diabetic condition in assigning him to a top bunk from which inmate later fell, where there was no awareness on the part of the defendant physician that a bottom bunk was a medical necessity, and, even if physician was negligent in failing to see the need for a bottom bunk assignment, claims of negligence—without a culpable state of mind—do not rise to the level of an Eighth Amendment violation).

With respect to inadequate medical care, the allegations of the complaint fail to establish both the objective and subjective components of an Eighth Amendment

claim. Plaintiff admits that when he regained consciousness after the fall on June 21, he was surrounded by a nurse and up to *five officers*. Nurse Benfatto then directed that Plaintiff be picked up and taken away by those officers to a wheelchair, and by doing so Benfatto reduced the chances that Plaintiff would exacerbate any fall-related injuries by not allowing him to walk unassisted. Benfatto also conducted a physical assessment of Plaintiff, administered seizure medication to him via an IV, and provided him with acetaminophen and Robaxin. Benfatto saw Plaintiff again the next day (June 22) at his request, and in the interim she had discussed Plaintiff's case with Dr. Smith. Although Plaintiff complained of pain and asked to be seen by Dr. Smith, Benfatto advised that there was nothing else she could do for him because Dr. Smith made his own decisions as to when he would see inmate patients.

Plaintiff was seen again the following day, on June 23, this time by Nurse Klee, and although Plaintiff again asked to see Dr. Smith (or to be taken to an E.R.), his request was not granted, as Dr. Smith was aware of his situation and had advised that he would decide when to see patients.[2] Then, on June 25, Plaintiff was seen by a third nurse, Allison Burgess. Again, Plaintiff asked to be taken to an E.R., but Burgess

---

[2] In fact, after Plaintiff's visit with Klee on June 23, Dr. Smith directed ECJ staff to move Plaintiff from his regular cell and place him in an isolation cell (ECF No. 12 at 8). Plaintiff complains that he should have been placed in the infirmary, not in isolation, but this difference of opinion does not amount to a constitutional violation. It does, however, show that Dr. Smith was monitoring Plaintiff's situation, as Plaintiff had been informed by several nurses.

advised Plaintiff that he would not be taken to an E.R. because Dr. Smith did not believe such was necessary.  *See* Bauer v. Kramer, 424 F. App'x 917, 919 (11th Cir. 2011) (nurses and other such prison personnel are not deliberately indifferent when they reasonably follow a doctor's orders) (unpublished opinion); *see also* Holloway v. Delaware County Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (holding that nurses may generally defer to instructions given by physicians unless it is clear that doing so will likely cause significant harm to the inmate).

Nurse Burgess did arrange for Plaintiff to be x-rayed on June 27.  The results of this x-ray are not set forth in the complaint, but notably, the allegations of the complaint show that Plaintiff was not seen by medical staff upon demand *after* the x-ray was obtained, as he had been *before* the x-ray was obtained.  Moreover, the only *diagnosis* Plaintiff references in the complaint is "muscle spasms" (and he does not tie this diagnosis to the fall).  Additionally, after Plaintiff returned to GCI, he was prescribed the same medications administered by Benfatto, to include over-the-counter pain medication (i.e., acetaminophen) and Robaxin. Similarly, Nurse Burgess also recommended over-the-counter pain medication as well, when she saw Plaintiff in mid-August 2017.  Although Plaintiff notes that he will "soon be[] scheduled" for a test on his neck at GCI (ECF No. 12 at 10), this sheds little light on the issue of

whether Plaintiff had an objectively serious medical need while housed at ECJ that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill, 40 F.3d at 1186.

Regardless, even if Plaintiff has demonstrated the existence of a serious medical need, his allegations do not show that the ECJ medical Defendants' response to that need was so deficient as to constitute an unnecessary and wanton infliction of pain. As detailed above, Plaintiff received immediate treatment after his fall from Defendant Benfatto; he attended follow-up visits on two consecutive days thereafter (and thus was seen by three different nurses in three days); and he obtained an x-ray within one week of the fall. What is more, Dr. Smith was apprised of Plaintiff's case and oversaw his course of treatment.

Although Plaintiff complains about not being seen after the x-ray of June 27, until August 21—despite numerous sick call requests and grievances asking to be seen—it is evident that the medical professionals did not view Plaintiff's condition as warranting any medical treatment beyond over-the-counter medication available to Plaintiff at the commissary. As Plaintiff was previously advised, his disagreement with the manner or extent of the treatment he received at the jail does not alone establish deliberate indifference at the hands of the Defendants. Cf. Mandell v. Doe,

888 F.2d 783 (11th Cir. 1989) (when need for treatment is *obvious*, medical care for prisoner which is so cursory as to amount to no treatment at all may amount to deliberate indifference). Thus, Plaintiff has failed to state a plausible Eighth Amendment against Defendants Benfatto, Burgess, Klee, and Smith.[3]

Accordingly, it respectfully **RECOMMENDED**:

1. That this case be **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915A(b)(1);

2. That the clerk enter judgment accordingly and close this case.

At Pensacola, Florida, this 23rd day of August 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or**

---

[3] A final point bears mention. Plaintiff was previously advised of each of the above-listed deficiencies (*see generally* ECF No. 7) but has still failed to allege sufficient facts to state a plausible claim as to any Defendant.

Case No.: 3:19cv332/MCR/EMT

**recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**